LE MARCHEL v. TEAGARDEN.

(Circuit Court, W. D. Arkansas, Harrison Division. April 7, 1907.)

1. PUBLIC LANDS—PATENTS—EFFECT.

A patent to land of the disposition of which the department has jurisdiction is both the judgment of that tribunal and a conveyance of the legal title to the land.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 314.]

2. SAME—VACATION.

Where the officers of the land department have been induced to issue a patent to the wrong party, either by an erroneous view of the law or by gross or fraudulent mistake of the facts, the party entitled to the land may have the patent set aside on proof either that on the facts found, conceded, or established, without dispute at the hearing before the department, its officers erred in the construction of the law applicable to the case, which caused them to refuse to issue the patent to complainant, or that through fraud or gross mistake they fell into a misapprehension of the facts proved before them, which had the like effect.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, §§ 339, 340.]

3. SAME—FRAUD—QUANTUM OF PROOF.

Where a patent issued by the land department is attacked for mistake on the part of the government's officers, the complainant must allege and prove, not only that there was a mistake in the findings, but the evidence before the department from which the mistake resulted, the particular

mistake that was made, the way in which it occurred, and the fraud, if any, which induced it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 335.

Decisions of the land department, their conclusiveness and effect, see note to Hartman v. Warner, 22 C. C. A. 38; Carson City Gold & Silver Min. Co. v. North Star Min. Co., 28 C. C. A. 344; Uinta Tunnel Min. & Transp. Co. v. Creede & C. C. Min. & Mill. Co., 57 C. C. A. 207].

4. SAME—DUTY OF ENTRYMAN.

Where an applicant for a cash entry of public land regularly applied to enter the land, paid the price, and obtained his receipt therefor, he was under no obligation to supervise the entries on the books of the register of the land office, in order to see that the proper entries were made.

5. SAME—VACATION OF ENTRY.

The records of the land office and the decision of the Interior Department with reference to a land entry could not be overturned 50 years after they were made and after the patentee had died, because of evidence that the patentee intended to enter the land for mill purposes, and that he erected a mill on an adjacent tract and not on the property entered, on which no water power existed.

6. SAME—SUBSEQUENT ENTRY.

G. made a cash entry on land in controversy in 1848, which immediately rendered the land subject to taxation, and withdrew it from the operation of the United States land laws. By mistake of the register in a land office, a patent was issued for another tract and long after G.'s death, the error was corrected, the original patent canceled, and a correct patent issued to G. and his heirs for the land in controversy, pending which complainant had made a homestead entry on the land. *Held,* that the land was not subject to homestead entry at the time complainant attempted to enter it, and that he had no rights therein.

For former opinion, see 133 Fed. 826.

Crump & Trimble and Woods Bros., for complainant.
Sewell & Sewell and J. W. Story, for defendant.

ROGERS, District Judge. On November 4, 1848, William Goodall made cash entry for the S. E. ¼ N. W. ¼, section 11, township 17 N., range 15 W. (situate in Marion county, Ark.), at the Batesville (now Harrison, Ark.) district land office. The practice of the office at that time, when a cash entry was made, was this: The receiver, when the money was paid for the land entered, issued duplicate receipts, describing therein the land entered, the price paid, and the quantity of the land. One of these receipts he gave to the purchaser and the other to the register. Predicated on this receipt the register made the necessary entries on the tract book and plats of his office, and issued the certificate of entry in favor of the purchaser for the land so entered. Monthly reports were made of his action to the General Land Office, and, on presentation of the certificate of entry to the General Land Office, the patent was issued thereon if everything appeared regular. In this case the receiver's receipt correctly described the land entered, shows the price paid, and the number of acres, and the land described in the receipt is the S. E. ¼ N. W. ¼, section 11, township 17 N., range 15 W.; but the register's certificate, issued the same day, incorrectly shows the land entered by Goodall to have been the S. E. ¼ N. W. ¼, section 11, township 16 N., range 15 W. The first

tract is in Marion county, and the latter in Searcy county, and are situate several miles apart. July 1, 1850, the patent was issued upon the Goodall entry, in accordance with the erroneous description appearing in the register's certificate. The patent so issued was duly transmitted to the local land office at Batesville, for delivery, but was never delivered, and in 1896 was burned, with other records of the Harrison land office. In 1892 the local land office, having discovered some confusion in the records of the local office as to the Goodall entry, advised the General Land Office that their tract books showed Goodall's entry to be for the S. E. ¼ N. W. ¼, section 11, township 17 N., range 15 W. (that being the tract described in the receiver's receipt), while the plat in their office showed it to be for the S. W. ¼ N. W. ¼ of said township, section, and range, which was a different tract from that described in either the receivers' receipt or the registers' certificate, or the tract book or in the patent issued, and inquired what land was covered by the Goodall entry. At that time, obviously, the officers of the General Land Office had not discovered that the registers' certificate differed from the receivers' receipt, and consequently the patent which had been issued was for a tract not entered by Goodall. Accordingly, on March 26, 1892, the Commissioner of the General Land Office advised the local officers at Harrison, Ark., that the Goodall entry was for the S. E. ¼ N. W. ¼, section 11, township 16 N., range 15 W., and that the entry had been patented July 1, 1850. Without any notice to Goodall, or his heirs, or those claiming under him, the officers of the General Land Office and the local land office at Harrison, on March 2, 1892, arbitrarily altered the tract books in both offices, which from November 4, 1848, had shown that Goodall entered the S. E. ¼ N. W. ¼, section 11, township 17 N., range 15 W., so as to make it appear that his entry was for the S. E. ¼ N. W. ¼, section 11, township 16 N.; range 15 W., thereby making the tract books conform to the patent previously issued, and which was predicated on the incorrect description in the registers' certificate. These alterations were not made by erasures, but by simply running a line with pen and ink through the correct entry where it appeared on the tract book and then inserting the incorrect entry opposite, and was manifestly done in good faith by the local office, and in the General Land Office, which had not discovered the error in the register's certificate.

The effect of all this was to make it appear on the records of both the General Land Office and the local office at Harrison that the land in controversy at that time the S. E. ¼ N. W. ¼, section 11, township 17 N., range 15 W., was vacant land and subject to homestead entry. Indeed, some time in 1893 (letter not dated) complainant wrote the General Land Office inquiring the status of the land in controversy, and advising it that "the books of the Harrison land office show it to be vacant, which is disputed." On September 30, 1893, the acting commissioner of the General Land Office replied, stating that the tract books showed the land vacant so far as returns had been received, but some entry might have been made at the local office. Some other correspondence ensued about the status of the land, and finally, on December 28, 1893, complainant entered the land in controversy,

among others, as a homestead, and in January, 1894, began improving it, and finally, in apt time, moved on the land and made it his home. After living there 5 years, he gave the notice and made his final proof. Meantime the land was forfeited to the state for the taxes of 1896 and 1897, and on January 24, 1901, defendant bought and obtained a deed therefor from the state, and in March of the same year obtained quitclaim deeds from the heirs of Goodall. On February 15, 1901, defendant, in the name of the Goodall heirs, and with their consent, filed an application in the General Land Office to cancel the patent issued on July 1, 1850, to their ancestor William Goodall, because it misdescribed the land entered by him, and also for the issuance of a patent to the land actually entered by him; it being the land in controversy. Notice of this application was given complainant and he appeared. Both sides offered evidence, and the case was heard by the Commissioner, and decided in favor of the complainant. On appeal to the Secretary of the Interior, the Commissioner of the General Land Office was reversed, the patent canceled as erroneous, and a patent for the land in controversy was issued on the 27th of May, 1903, to the Goodall heirs, reciting that it was issued in lieu of the one canceled. This patent, of course, inured to the benefit of Grant Teagarden, who, as stated, already had quitclaim deeds from the Goodall heirs, and also a deed from the state. Thereupon Grant Teagarden instituted ejectment against complainant and recovered judgment against him in this court. Before said judgment was recovered this bill was filed, and a decree was asked declaring said Grant Teagarden a trustee for the complainant, and compelling him to convey the lands to him; he being the equitable owner under his homestead entry. That complainant has complied with the homestead law so far as residence and improvement of the land is concerned is not in controversy.

The rules of law governing cases of this character, where the action of a department of the government having jurisdiction of the subject-matter and parties is assailed for error and fraud, is so well stated in James v. Germania Iron Company, 107 Fed. 597, 46 C. C. A. 476, that I quote from the opinion of Judge Sanborn (Judges Caldwell and Thayer, both concurring) as follows:

"The land department of the United States is a quasi judicial tribunal, invested with authority to hear and determine claims to the public lands subject to its disposition, and its decisions of the issues presented at such hearings are impervious to collateral attack, and presumptively right. A patent to land of the disposition of which the department has jurisdiction is both the judgment of that tribunal and a conveyance of the legal title to the land. Act March 3, 1849, c. 108, § 3, 9 Stat. 395; Rev. St. §§ 441, 453 [U. S. Comp. St. 1901, pp. 253, 257]; U. S. v. Winona & St. Paul R. Co., 67 Fed. 948, 955, 15 C. C. A. 96, 103, 32 U. S. App. 272, 283. But the judgment and conveyance of the department do not conclude the rights of the claimants to the land. They rest on established principles of law and fixed rules of procedure, which condition their initiation and prosecution, the application of which to the facts of each case determines its right decision; and, if the officers of the land department are induced to issue a patent to the wrong party by an erroneous view of the law, or by a gross or fraudulent mistake of the facts, the rightful claimant is not remediless. He may avoid this decision, and charge the legal title derived from the patent which they issue with his equitable right to it on either of two grounds: (1) That upon the facts found, con-

ceded, or established without dispute at the hearing before the department its officers fell into an error in the construction of the law applicable to the case which caused them to refuse to issue the patent to him, and to give it to another (Bogan v. Mortgage Co., 63 Fed. 192, 195, 11 C. C. A. 128, 130, 27 U. S. App. 346, 350; U. S. v. Winona & St. P. R. Co., 67 Fed. 948, 958, 15 C. C. A. 96, 106, 32 U. S. App. 272, 288; U. S. v. Northern Pacific R. Co., 95 Fed. 864, 870, 37 C. C. A. 290, 296; Cunningham v. Ashley, 14 How. [U. S.] 377, 14 L. Ed. 462; Barnards' Heirs v. Ashley's Heirs, 18 How. [U. S.] 43, 15 L. Ed. 283; Garland v. Wynn, 20 How. [U. S.] 6, 15 L. Ed. 801; Lytle v. Arkansas, 22 How. [U. S.] 193, 16 L. Ed. 306; Lindsey v. Hawes, 2 Black [U. S.] 554, 562, 17 L. Ed. 265; Johnson v. Towsley, 13 Wall. [U. S.] 72, 85, 20 L. Ed. 485; Moore v. Robbins, 96 U. S. 530, 538, 24 L. Ed. 848; Bernier v. Bernier, 147 U. S. 242, 13 Sup. Ct. 244, 37 L. Ed. 152); or (2) that through fraud or gross mistake they fell into a misapprehension of the facts proved before them, which had the like effect (Gonzales v. French, 164 U. S. 338, 342, 17 Sup. Ct. 102, 41 L. Ed. 458). If he would attack the patent on the latter ground, and avoid the departments finding of facts, however, he must allege and prove not only that there was a mistake in the finding, but the evidence before the department from which the mistake resulted, the particular mistake that was made, the way in which it occurred, and the fraud, if any, which induced it, before any court can enter upon the consideration of any issue of fact determined by the officers of the department at the hearing. U. S. v. Northern Pacific R. Co., 95 Fed. 864, 870, 882, 37 C. C. A. 290, 296, 308; U. S. v. Atherton, 102 U. S. 372, 374, 26 L. Ed. 213; U. S. v. Budd, 144 U. S. 154, 167, 168, 12 Sup. Ct. 575, 36 L. Ed. 384; U. S. v. Mackintosh, 85 Fed. 333, 336, 29 C. C. A. 176, 179, 56 U. S. App. 483, 490; U. S. v. Throckmorton, 98 U. S. 61, 66, 68, 25 L. Ed. 93; Marquez v. Frisbie, 101 U. S. 473, 476, 25 L. Ed. 800; Steel v. Refining Co., 106 U. S. 447, 451, 1 Sup. Ct. 389, 27 L. Ed. 226; French v. Fyan, 93 U. S. 169, 172, 23 L. Ed. 812; Ehrhardt v. Hogaboom, 115 U. S. 67, 69, 5 Sup. Ct. 1157, 29 L. Ed. 346; Heath v. Wallace, 138 U. S. 573, 575, 11 Sup. Ct. 380, 34 L. Ed. 1063; Barden v. Railroad Co., 154 U. S. 228, 14 Sup. Ct. 1030, 32 L. Ed. 992."

See, also, Gonzales v. French, 164 U. S. 338, 17 Sup. Ct. 102, 41 L. Ed. 458. Other cases along the same line may be cited but it is useless.

This bill assails the decision of the Secretary on both grounds stated, but it falls far short of a compliance with the rules of law there stated as to either. From the record it appears that, when the case was before the Interior Department, there was a mass of evidence, including records and ex parte affidavits introduced, and the effort made to show that the patent issued July 1, 1850, correctly described the land actually entered by Goodall, and therefore should not be canceled and a new patent issued for the land in controversy. So far as can be ascertained, such was the purpose when the original and amended bills were filed in this case. In the first amended bill the effort is made to show that the land really entered by Goodall is another 40 acres, north of the land in controversy, and in the same section, township and range. The second amended bill of complaint sets out the affidavits used in evidence for the cancellation of the patent issued July 1, 1850, and for the issuance of a patent for the land in controversy, and alleges that those affidavits were false, but omits any reference to the records before the Interior Department. The fact is that the affidavits were of no importance. They were irrelevant, and a glance at the Secretary's opinion discloses clearly that they were not considered, at least, not controlling. His decision was based on the record of the local and General Land Offices. Those records on which his opinion is predicated were not assailed by complainant. Indeed, he relied on them as they then appeared as show-

ing his right to the homestead entry. The written application for the Goodall entry is not produced. The registers' certificate, presumably made thereon in conformity to the practice, is not before me. Presumably, the paper is lost or burned, but the receivers' receipt, which was the next step in making the entry, is produced, and it shows the entry to be the land in controversy. The tract books in the General Land Office and the local land office both showed the same thing, until they were, without any legal authority, changed to conform to the registers' certificate and the subsequent patent issued thereon. These facts which are matters of record remain unaltered by the proof, and on which was predicated the opinion of the Secretary of the Interior. Goodall had applied to enter and had paid for the land in controversy, and got his receipt therefor. That was all the law required him to do. The officers of the United States were to do the rest. He was not required to supervise the entries on the books of the register, and the law presumes the register would do his duty, and Goodall had the right to rely on that presumption. The principle is stated in Wirth v. Branson, 98 U. S. 118, 25 L. Ed. 86, as follows:

"A party who has complied with all the terms and conditions which entitle him to a patent for a particular tract of public land acquires a vested interest therein, and is to be regarded as the equitable owner thereof. While his entry or location remains in full force and effect, his rights thereunder will not be defeated by the issue of a patent to another party for the same tract."

In Chowning v. Stanfield, 49 Ark. 93, 4 S. W. 278, the court says:

"Few propositions are better settled than that the rights of one who has done all that the law requires of him cannot be impaired by the subsequent neglect or want of fidelity of a public officer. Lytle v. State of Arkansas, 9 How. (U. S.) 333, 13 L. Ed. 153; Coleman v. Hill, 44 Ark. 452; Stark v. Mather, 12 Am. Dec. 567, note; Nelson v. Simms, 23 Miss. 383, 57 Am. Dec. 144."

In the application of the Goodall heirs to cancel the patent issued July 1, 1850, it was stated, and proof offered pro and con, that Goodall entered the land for mill purposes, and that he died while erecting a mill on the same. There is also proof showing that the land patented to him July 1, 1850, was in the mountains, where there never was any water power. This having been ascertained, complainant is now offering to show that there is no water power, and no mill was ever erected on the land in controversy, but that the remains of an old mill is found on the 40 acres north of this land in controversy, in the same section, township, and range, and from this fact it is argued that Goodall never intended to enter this land, but did intend to enter the 40 north of it, where there was water power, and where there is now the remains of an old mill. I do not attach any importance to the statement of the Goodall heirs, in their application for the cancellation of the patent of July 1, 1850. They removed from Arkansas about 1850, more than 50 years ago, were then children, reared in the mountains of northwest Arkansas, and never had lived on the land in controversy. Only one of them claims to have ever seen the mill. It is an absurdity to suppose they knew the numbers of the land entered by their father, or whether the mill was erected on any particular 40-acre tract. It was not only an absurdity on its face, but it was utterly immaterial. The records of the land office and the decision of the Department of

the Interior are not to be overturned in that way, or by evidence of that character. And this view is borne out by the evidence of the Goodall heirs themselves, subsequently taken, which establishes conclusively that they knew nothing about what lands he entered. Nor are the records of the land office and the decision of the Interior Department to be overturned 50 years after they were made, and after the patentee, Goodall, in this case, is dead, because it can be shown that the land he intended to enter was for mill purposes, and that he erected a mill on another 40-acre tract adjacent, and that there was no mill erected, and no water power on the tract which the records of the land office show he entered. Titles to real estate rest on something more substantial than evidence of this character. Goodall may have intended to enter the tract on which the remains of the old mill are now found, but the records show he entered another. Even the patent, erroneously issued, was not for the tract north of the land in controversy on which the remains of the old mill are found, nor is there any entry or any record showing he entered the 40 north of the tract in controversy. There was a remedy for Goodall if he made a mistake in his entry, if it had been invoked in apt time, but neither he nor his heirs, nor those holding under him, ever claimed that he intended to enter the 40 north of the tract in controversy, nor could they be heard to do so now. They are estopped by their own action had before the Interior Department. Nor can complainant or any one else invoke a correction of an entry for them. It is also urged that the quitclaim deeds from the Goodall heirs were obtained by fraud and misrepresentation. Be it so, how can that avail complainant? That is a matter they might, under a proper showing, assert, but, if asserted and successfully, the benefit would inure to themselves, and not to complainant. Indeed, complainant's right to recover in this suit depends upon the legal title being vested in defendant. If vested in him at all, it is because the patent to the Goodall heirs inured to his benefit by reason of the quitclaim deeds from the Goodall heirs to defendant. If the quitclaim deeds are broken down, the title is in the Goodall heirs, and complainant's right of action against defendant is defeated, and no right of action could be had against the Goodall heirs because they are not parties to the bill and have had no day in court. But as the case now stands this land having been assessed for taxes and forfeited to the state, and subsequently sold to defendant, he holds the title adverse to the Goodall heirs, and also adverse to the complainant.

It accordingly appears that on November 4, 1848, William Goodall entered the tract of land in controversy; that immediately upon its entry it was subject to taxation, and withdrawn from the operation of the land laws of the United States; that by the mistake of the register of the land office a patent was issued for another tract, which is not that entered by Goodall; that long after the death of Goodall the error was corrected, the original patent canceled, and a correct patent issued to Goodall and his heirs for the land in controversy; that, when complainant made his homestead entry, it was not the property of the United States, nor was it subject to another entry for homestead purposes; that complainant's bill is without equity, and must be dismissed, at his own costs.